CANADY *v.* THE STATE.

12

*Bennett & Bennett* and *C. V. Stanton,* for plaintiff in error.

*George M. Napier, attorney-general, A. B. Spence, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

Hill, J.   The grand jury of Ware County indicted Emma Canady for the murder of John Canady, her husband, and alleged that she killed and murdered him "by shooting, stabbing, hitting and beating the said John Canady with a certain pistol, gun, rifle, and a piece of iron, and with an instrument to the grand jurors unknown, and in a manner and means unknown to the grand jury." The trial jury returned a verdict of guilty, with a recommendation that the defendant be imprisoned in the penitentiary for life; and she was accordingly so sentenced by the court.   She excepted to the overruling of her motion for a new trial.

The State relied for conviction upon a confession by the accused, with corroborating circumstances.   The evidence tended to show that she operated a restaurant in connection with her home at Waycross, Georgia, where she and her husband, John Canady, resided; that on the night of August 19, 1929, John Canady, Emma Canady, Eliza Hicks, and a child ate supper together in the restaurant at 8 o'clock p. m.; and that when John Canady had finished his supper he left, and was soon followed by his wife, who said to Eliza Hicks, "I am going down the street."   She came back to the house later and told Eliza that "John was gone to work, she didn't say where or nothing.   She says, 'Hurry and shut up.'"   Eliza Hicks sat up a little while, and then went to bed.   She testified: "Emma never did come back from down the street, and I didn't see her no more until about 12 o'clock.   I didn't have no time piece.   When I seen her she was to my bed.   I was asleep, and she was telling me to 'wake up, I got a telegram from your husband on the other side

of Homerville. You must come at once,' that my child was bad off sick. Her suit-case was down on the floor, back, and she called up the taxi and said she was coming with me, and it wasn't long before the taxi got there and carried us to Mitchell's house, and she went in the house. Harris, driving the taxi, the one she phoned for, carried us to Mitchell's. Mitchell is another taxi driver. Mitchell said something ailed his car, and she taken me to Maggie Canady's. Mitchell didn't come with us. When we got there Maggie's sister, Marie White, opened the door; we went in, and she [Emma Canady] told Maggie she got a phone message from her brother, and she was worried to death over the child, and she wanted me to stay there until she could go down, until she could get a taxi to go that night, and if she could not go that night she would go the next day, but for me to sure stay there until she come back and don't go over to her house until the next day. She says, 'Stay right here to Maggie's.' That was Monday night, the same night they say John Canady was killed."

Richard Mitchell, a taxicab driver, testified that on the night of the alleged murder the accused came to his house and asked him to drive her to DuPont. She said her brother's daughter was lying at the point of death, and she had just got the message and wanted to go. Mitchell told her he could not take her; the accused replied, "You are going to let me fall down; I just knowed you would have carried me since I am in this tight; I have just got to go." Marie White testified that on the night of the alleged murder Emma Canady came to her house and told her she had a telegram from her brother that the baby was bad off sick. Her sister-in-law was with her. Gus Reddick testified: On the night of the alleged killing the accused came to his house late at night and woke him up, and "it seemed like she was in a great rush. She wanted to go to Blackshear. She said, 'Make haste and hitch up and carry me to Blackshear.' I taken my old mule and wagon and got on the road, and we gets a pretty good little piece out on the road going to Blackshear. I asked her what she wanted to go to Blackshear for, and she says, 'I want to be away just as much as two or three days, and I will come back to Waycross and get me $500.' I carried her down to Blackshear, and we went down to a house, and out come a man, and I says, 'A lady wants to stop over with you to-night.' And he told her to come on in, and she went on in, and I walked

back and come on back to Waycross, and when I got back it seems to me like, as near as I could get after it, the sun was up an hour high in the morning. She says to me, her and her husband had taken a walk, shine walk, out down the Jacksonville road, and she said that she had killed him. When she came to my house she had a suit-case and the little dog, and she left the dog at my house and carried the suit-case with her. She said when she got a way down the Jacksonville road that she taken a soda-water bottle and she popped him over the head, and she said that she more than done it, she said a little spot of blood flew side of her jaw; and I looks back after her sitting on the wagon side of me, and I said, 'If you did, these white folks will kill me;' still not believing, gentlemen, that she would have done such a thing as that." John Brown, testified for the State that on the night of the alleged homicide he was living in Blackshear, and on that night a man came to his door and told him a lady wanted to spend the night at his house. He permitted the woman, whom he identified as the accused, to spend the night there. She told him that she was worried. Anna Bell Brown, the wife of John Brown, also identified the accused as the woman who spent the night at their house.

James Edwards, an undertaker, testified: The body of a man who had been run over by a railroad-train was brought to his establishment. The accused came there the next day about 4 or 5 o'clock, and said she wanted to see the suit-case. Witness brought out the suit-case, and she said it was hers, and that she lent it to her husband to go off to work. Witness opened the suit-case; the accused picked up a hat, threw it down, "went to hollering," and said that was her husband's hat, that she bought it from a man named Morgan. Witness put the hat into the suit-case, closed it, and told the man who was with her to take her out, she was about to faint. These two left with the hat and the suit-case. Augustus Scarlett, an undertaker, testified: "We went out and picked up a body off the Jacksonville railroad. It was, it looks like, about a mile below the section-house towards Jacksonville. The section-house may be a quarter of a mile below where Sweat Street crosses the Coast Line. I found part of the body. I didn't find all of it. He was cut at what I consider the waist line, that was mangled from the waist up. I could not tell who it was from the waist up. The part that was mangled, we found that between the tracks and

down side of it, and the part that was whole from his waist down we found lying in the ditch, kind of. We went up and picked it up. There was a suit-case when we got there, and it had 'nearly a quart of water in a bottle, and in that was two scraps of cloth about the size of your hand; and then we found a hat and then an old raincoat—a kind of a tan old raincoat, and a piece of iron about two feet long. That suit-case is very much like it. We brought the suit-case to the undertaker's, and it stayed there, I guess, for a day or so. That is the bottle and stuff there; that is the rain-coat; that is the hat; that is the piece of iron. I guess the iron is between 20 inches and two feet long and about three fourths of an inch square. It was lying beside the rain-coat; the rain-coat was lying on the ground and one end of it was lying on the rain-coat. The suit-case was closed when I saw it. When I found the piece of iron it was outside the suit-case. That [piece of iron] looks like a piece of steel. It is not the kind of iron they usually use to reinforce concrete. It could be used for heavy reinforcement; it could have fallen out of a train. I think a lot of freight-trains pass there. When Emma went to the undertaker's and got this suit-case the iron was in the suit-case; it was put in there when we found the body. I only saw two blood spots. One about the size of your hand, just outside the track, perhaps two feet from where the body cut into. About thirty inches from that was a puddle of blood in the middle of the track."

L. C. Miller testified that he was manager of the Morgan Plan Company Incorporated. In the year 1929 he had several transactions with the accused. On May 29 she obtained a loan from his company. On August 19 she applied for another loan. J. W. Boler testified that he was engaged in second-hand furniture business. About ten days before John Canady was killed, the accused applied to him for a loan of $50 to $60; she said that the reason she came was that she owed me some money on her account, and she wanted to get all her accounts together, and it would take about that much to do it; that she wanted to owe one person. James Edwards, recalled, identified the hat that accused said she bought from Mr. Morgan for her husband. "When I picked the hat up I saw the bruised place where it was torn there. That is the hat that I paid attention to by the bruised place. I didn't pay the same attention to the rain-coat. I just picked the bottle up and smelled

it and put it back. As to the suit-case, all I know was it was just a dark looking suit-case." William Morgan testified: "This was my hat. Emma bought it from me for John Canady about two months before he was killed." Willie Brown testified: "I know Emma Canady. I have known her eight months. I lived with her. She was living with John Canady, her husband then. I went there in February of this year, and about a month and a half after that she came to me one day and asked me would I keep a secret, and I told her it was according to what it was, and she didn't say no more about it. So the next day after that I was in the restaurant, I and her; there was no one else in there; and she said that her husband had all of her household goods in pawn, or something or other. Some Morris Plan Bank or something or other, and he had pawned them to the Morris Plan Bank; and she had to have some money and didn't know how to get none, so he was not no good to her living. She said he was better to her dead than he was living, and I asked her then what she wanted me to do about it, and she said, 'If you will go out there where he is and kill him, I will give you $500.' That was the second time she asked me that, and I said, 'No, I wont do nothing like that, not me.' So she went on then and didn't say no more about it until, I reckon, about three or four weeks after that, she came back to me again and asked me; so she told me then if I would do it she would give me $25, and she showed me a piece of iron I could carry with me to do it with. The iron was in the room where I stayed, behind the dresser; a square piece of steel; that is the very piece of iron right there. I told her no, I wouldn't do that. I moved from the house then, and went back out there on Friday, and she had my clothes tied up in her house, and she said, 'If you will do what I told you to do, I will give you your clothes and $25.' And I said, 'No, I will get my clothes if I don't do that, and if you ask me about that again I will jump on you,' and she taken out a peace warrant for me then and said that I wanted to jump on her. When I had my trial I told the officers about what she tried to get me to do to John in court. That piece of iron has been here in jail, because I saw it before they took me out. I didn't owe her $10. I owed her $2.75. I told her if she ever asked me to kill her husband I would give her hell. She didn't have no business asking me that;

he didn't do nothing to me. I didn't want to kill him. I didn't pay my board bill, $2.75; she put me in jail."

William Harris, a witness for the State, testified that he was at the home of the accused just before her husband was killed; that accused asked him if the Atlantic Coast Railroad paid for people killed on the railroad, and he told her he didn't know. She asked if the Coast Line paid for people that got killed by a train. Witness's aunt was with him. She told the accused that she (the aunt) got paid when the uncle of witness was killed. Accused asked whether "Miss Josephine got paid for Burie Jones when he was killed. I told her I didn't know. Emma and I was just talking when she asked me about the Coast Line paying people when they got killed." At this point the State offered in evidence an insurance policy issued by Atlanta Life Insurance Company on April 17, 1922, for $500, on the life of John Canady, originally payable to Josephine Simmons, and transferred from her to Emma Canady in December, 1927. Etta Demson testified: "That is a $500 straight-life policy. It has not expired. This is a paid-up policy, because I have wrote insurance myself for the same company. This is a policy, if you have been in it for over four years, and you are unable to pay the premium, they will carry you for four years; and if anything occurs, they will pay the beneficiary."

L. C. Warren, the sheriff of Ware County, testified: "I know Emma Canady. I investigated the death of her husband. She made a statement with reference as to how he was killed; the statement was freely and voluntarily made, and without the slightest hope of reward or the remotest fear of injury. She was in the office of the jail. She had been in jail since two days after the man was found killed, except we taken her to Blackshear, Patterson, and out from Patterson in the country to where she said was her brother. She was under arrest at the time. We took her to those places at her request, and to investigate the case. We have given quite a bit of time to getting a statement out of this woman. We have questioned her continuously for two or three hours without stopping; the first night was the longest of all. We started one night about twelve o'clock, and we sat around there; we did sit up rather late that morning. I'll be dog if I know what time; it was just about all night. As to our treatment, the biggest thing that I ever asked Emma to do was to tell the truth, inasmuch as

it was so badly mixed up; and I persuaded on her at all times, and I think she will say so, to let me have the facts, and not keep having me lock up innocent people. I never did get rough. Q. Why was it necessary to question her so much? A. At that time she had four or five different people in jail, and I also would gather from her conversation that she wasn't telling me the truth, and if I could go ahead just a little bit different I would make this thing clear. Emma would put it on to some one, and we would go out and get this party, whoever it should be, and bring them in, and she would say, 'There is no use to punish innocent parties; he is not guilty; turn him loose, white folks.' I went from my house into the jail office. I thought the deputies was there, but they wasn't. So I came to the office of the court-house and came back. Mr. Mock, Mr. Johnson, Mr. Aycock, and Mr. Freeman, I am sure were all present. I was sick at the time, and I sat down in a chair, and she sat down on a box in front of me, and I said to her, 'Emma, are you ready to give me the facts in this case?' and she said, 'Mr. Warren, I believe you are a good man; you have begged so hard and so pitiful for me to tell the truth, it looks like it worries you, and I am going to sit down and tell you the cold truth.' She said, 'I killed John Canady myself with a piece of iron that is in this suit-case,' and I said 'Who was with you, Emma?' She said, 'No one.' I had just asked her at all times to tell the truth about it. I did not do anything except ask her, and I did not threaten her in any way. None of my officers present threatened her in any way; everybody was sitting quietly, and I was the only one saying a word; we had the iron there at that time; the suit-case was in the jail office, opened about like that [indicating] ; 'with that very piece of iron' was the words she said. She said she struck him twice. She said when she struck him he fell across the railroad-track. She said he fell across the railroad-track, and she said, 'I threw down that piece of iron and flew, and when I got home I was wet all over. I was first up and down falling and running and stumbling. I was wet to my neck.' "

L. C. Warren, recalled, testified: "The body alleged to be John Canady was found on the railroad-track east of Waycross on Tuesday morning, last month, 1929. I went down there where the body was mutilated on the track, after the body was picked up. I saw the signs there where it was mutilated. That is in Ware

County." Augustus Scarlett, recalled, testified: "I am the man who brought in the suit-case and the bottle and the iron; it was there when I got there. I found it near 10 o'clock. I do not know how it got there; some one else could have put it there. There were people there when I got there." Wade Clark testified: "I am an engineer with the Atlantic Coast Line Railroad Company. I was with them in August, 1929. I left here that night at 9 o'clock, going to Jacksonville as engineer on a freight-train. After I got out of Waycross I saw two negroes standing by the track down below the 98 milepost, with a suit-case in their hand. That is not right at the section-house, beyond it toward Jacksonville. Two negroes were standing; one was right at the track and the other one was down just as far as the water let him walk and the one near the track had a suit-case. I did not know whether they were trying to catch the train or not. It looked like they was just as close as they [could] be to the track, that one with the suit-case, not to be hit. It just did brush by. I met No. 56 at Ft. Mudge, and No. 56 had a chance to have passed the spot where I saw the two people near the track at between 10:05 and 10:10. The two people I saw, I could tell they were colored people, not white. I took them both for men. I couldn't say whether the one nearest the track was a man or a woman, but I took them both for men. The one nearest the track was carrying the suit-case."

The defendant made a statement in which she denied killing her husband. She claimed that her confession was extorted by the sheriff and his deputies. She said that white people had murdered her husband because he had engaged in selling whisky. The sheriff, recalled, denied her statement with reference to the confession being extorted from her.

■ The evidence was sufficient to corroborate the confession of the accused as to the homicide, and was sufficient to authorize the jury to find her guilty. The trial judge being satisfied with the verdict, a new trial on the general grounds of the motion was properly refused. Grounds 4 and 5 of the motion for new trial are but elaborations of the general grounds. The first complains that the evidence failed to show that the person killed was John Canady; and the second, that the evidence fails to show that John Canady or any other person was killed by the defendant in the

manner described in the indictment. As held above, the evidence is sufficient to show these two facts.

■ Ground 6 of the motion for new trial complains that the court committed error in admitting in evidence, over objection, the life-insurance policy hereinbefore described. This policy was admissible in evidence to show motive for the killing, and its admission was not error on the grounds (a) that there was no evidence to show that the policy was in force at the time of the alleged homicide, or that the defendant had any knowledge or information that it was in force at the time of the death of John Canady; (b) that there was not sufficient evidence to show that the policy had lapsed more than three months prior to the alleged homicide; (c) that there was no evidence that the policy came from the possession of the defendant after the alleged homicide of John Canady, or that the defendant had any knowledge that the policy was in existence, or had any value at the time of the alleged homicide.

■ Error is assigned because the court erred in refusing, at the conclusion of the testimony, to direct a verdict of not guilty. It is not error to refuse to direct a verdict. *Cureton* v. *Cureton*, 132 *Ga.* 745 (65 S. E. 65).

■ Another ground complains that there was not sufficient evidence to establish, "to a moral and reasonable certainty and beyond a reasonable doubt, the venue of said alleged homicide, it not being established by any of the evidence introduced by the State that the alleged homicide of the deceased, John Canady, occurred in Ware County, Georgia. L. C. Warren testified: "The body alleged to be John Canady was found on the railroad-track east of Waycross on Tuesday morning, last month, 1929. I went down there where the body was mutilated on the track, after the body was picked up. I saw the signs there where it was mutilated. That is in Ware County." Another witness testified that the scene of the homicide was "between Waycross and Astoria on the Jacksonville road." Augustus Scarlett testified: "We went out and picked up a body off the Jacksonville road. It was, it looks like, about a mile below the section-house towards Jacksonville. The section-house may be a quarter of a mile below where Sweat Street crosses the Coast Line. I found part of the body. I didn't find all of it. He was cut at what I consider the waist line; that was mangled from the waist up. I could not tell who it was from the waist up. The part

that was mangled we found that between the tracks and down side of it, and the part that was whole from his waist down we found lying in the ditch, kind of. We went up and picked it up. There was a suit-case when we got there, and it had nearly a quart of water in a bottle, and in that was two scraps of cloth about the size of your hand; and then we found a hat and then an old rain-coat— a kind of a tan old rain-coat, and a piece of iron about two feet long. That suit-case is very much like it. We brought the suit-case to the undertaker's, and it stayed there, I guess, for a day or so. That is the bottle and stuff there; that is the rain-coat; that is the hat; that is the piece of iron. . . It was lying beside the rain-coat; the rain-coat was lying on the ground and one end of it was lying on the rain-coat. The suit-case was closed when I saw it. When I found the piece of iron it was outside the suit-case. . . It could have fallen out of a train. I think a lot of freight-trains pass there. When Emma went to the undertaker's and got this suit-case the iron was in the suit-case; it was put in there when we found the body. I only saw two blood spots; one about the size of your hand, just outside the track, perhaps two feet from where the body cut into. About thirty inches from that was a puddle of blood in the middle of the track." L. C. Warren, the sheriff, testified that the defendant said "she would carry us and show us where Bubba Murray, Lewis Akin, Pearly Wall murdered her husband. Mr. Hiers and myself got in the front seat, and Emma and Johnson in the back seat. She had not been there since we arrested her, she had been in jail; just as soon as she came back and called for the suit-case we arrested her. We knew about where it was, but we made it appear that we did not know; and she said she would go and show us, and she went out to her house and started off from where her and John was living on Walter Street. Mr. Hiers was driving, and he said, 'Now Emma, you tell me where to go to and all.' And she did. She went down to the Ratliff crossing down there on the Jacksonville highway or railroad, I imagine a couple of miles, on down below the milepost. · I am not sure what number, but it is right by where the man was killed, just, I will say, about 50 or 75 feet from where the man was killed; and she told Mr. Hiers to stop driving. She says, 'There is the post.' She got out and walked to the railroad, and said it was down below this next signal-post where they killed him, which

would put it somewhere between there and Astoria. She stayed there a minute or two and she looked around and turned her back towards Waycross on the railroad-track, and somebody said, 'Go ahead, Emma, and show us,' and she walked up, I will say, thirty feet; and there is where the man's body was mangled on the track right close. I had not been down there before." The foregoing evidence was sufficint to prove the venue in Ware County.

■ The motion for new trial complains that the court erred in charging the jury as follows: (a) "Before you would be authorized to convict on circumstantial evidence alone, the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused. The guilt of the defendant must be proved beyond a reasonable doubt, and must not rest upon mere conjecture or bare suspicion. Where all the facts and circumstances of the case and all reasonable deductions therefrom present two theories, one of guilt and the other of innocence, then the jury could acquit." (b) "If you have a reasonable doubt upon your minds, after going over the case carefully, as to the defendant's guilt, under all the facts and circumstances of the case and the defendant's statement, then it is your duty to give the defendant the benefit of the doubt and acquit her. If you do not have such doubt in your minds of the defendant's guilt, then it is your duty to convict her." The foregoing instructions were not erroneous on the ground that they were confusing and misleading, or for any other reason assigned.

The judge did not err in overruling the motion for a new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*